Gen. 45]                                                                 45

## CONSTITUTIONAL LAW

**FREEDOM OF RELIGION − FREE EXERCISE CLAUSE − VEHICLE LAWS − LICENSING − INDIVIDUAL WHO OBJECTS ON RELIGIOUS GROUNDS TO PHOTOGRAPH REQUIREMENT FOR DRIVER'S LICENSE NOT ENTITLED TO LICENSE WITHOUT PHOTOGRAPH**

May 10, 1994

*The Honorable James F. Ports, Jr.*
*The Honorable Alfred W. Redmer, Jr.*
*House of Delegates*

You have requested our opinion whether an individual has a legal entitlement to obtain a Maryland driver's license without a photograph (a "nonphoto license") if being photographed would be contrary to the individual's religious beliefs.

For reasons given below, we conclude that the State is not required to provide a non-photo license to an individual who objects on religious grounds to the inclusion of the individual's photograph on the license.

### I

### Background

Under §16-111(c) of the Transportation ("TR") Article, every driver's license "shall include" a photograph:

> (i)   If the licensee is under the age of 21 years, a profile photograph of the licensee; or
>
> (ii)  If the licensee is at least 21 years old, a frontal photograph of the licensee.

TR §16-115(e) does authorize the Motor Vehicle Administration ("MVA") to issue a renewed driver's license without a photo for individuals who are not in Maryland during the renewal period. The nonphoto license must bear the notation, however, that "it is valid without a photo until 15 days after the licensee first returns to the State." *See also* TR §16-114(e) (same provision for duplicate license). Additionally, under long-standing practice, the MVA will issue a 45-day, nonphoto license for an individual who has lost the original photograph license, but only if the individual seeking a duplicate license does not have the information necessary for reissuance. Once the individual furnishes the necessary information, a license bearing a photograph is issued. *See* TR §16-114(b).[1]

## II

## Free Exercise of Religion

### A.    *Introduction*

The First Amendment of the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof.*" U.S. Const., amend. 1 (emphasis added). *See also* Article 36 of the Maryland Declaration of Rights. The Fourteenth Amendment makes the First Amendment, including the portion commonly referred to as the Free Exercise Clause, binding on the states. *Cantwell v. Connecticut,* 310 U.S. 296, 303 (1940).

The Free Exercise Clause excludes all "governmental regulation of religious *beliefs* as such." *Employment Div., Dept. of Human Res. v. Smith*, 110 S.Ct. 1595, 1599 (1990) (quoting *Sherbert v. Verner*, 374 U.S. 398, 402 (1963)). For example, the government may not compel affirmation of religious belief or punish the

---

[1] The temporary nonphoto license may become unnecessary under the new driver's licensing system discussed in Part III below, because a digitized image and signature of the license will be on file. In the event that the license is lost or stolen, the MVA database can retrieve the photo and signature to verify the applicant's identity for reissuance. *See* Motor Vehicle Administration Press Release, November 29, 1993, at 1.

expression of religious doctrines it believes to be false. *Smith*, 110 S.Ct. at 1599. In other words, the freedom of belief is absolute. *United States v. Ballard*, 322 U.S. 78, 86 (1944). *See also Snyder v. Holy Cross Hosp.*, 30 Md. App. 317, 327, 352 A.2d 334, *cert. denied*, 276 Md. 750 (1976).

The manner in which one acts on one's beliefs, however, is not immune from governmental regulation. *Ballard*, 322 U.S. at 86. *See also Snyder,* 30 Md. App. at 327. Actions may be regulated even when performed out of religious duty. *Sherbert*, 374 U.S. at 403.

### B.    *Threshold Elements of a Free Exercise Claim*

The party objecting on religious grounds to a state regulation must demonstrate that the objection is grounded upon a sincerely held religious belief. *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972). On that point, the Supreme Court said:

> Although a determination of what is a "religious" belief or practice entitled to constitutional protection may present a most delicate question, the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests.

406 U.S. at 215-16 (footnote omitted). That is, the belief must be something more than a purely secular philosophical or personal belief. *See Syska v. Montgomery County Bd. of Educ.*, 45 Md. App. 626, 632, 415 A.2d 301, *cert. denied*, 288 Md. 744 (1980), *appeal dismissed*, 450 U.S. 961 (1981) (objection to compulsory immunization, based on purely secular considerations, "are philosophical and personal rather than religious [and] do not rise to the demands of the Religion Clauses").[2] For purposes of this

---

[2] The sincerity of one's belief is not the same as the truth or falsity of the belief. An inquiry into the latter is forbidden. *See United States v. Ballard*, 322 U.S. at 86.

opinion, we shall simply assume that an individual who objects to a photo license does so because of a sincerely held religious belief.[3]

Upon a showing that religious beliefs are sincere, the determination must next be made whether the law infringes upon those beliefs. A burden on religion exists when "the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by a religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs ...." *Thomas v. Review Board of Indiana Employment Sec. Div.*, 450 U.S. 707, 717-18 (1981).[4]

The MVA will not issue a driver's license without a photograph except temporarily, and only for the limited reasons discussed in Part I above. An individual who for religious reasons objects to a photo license is faced with the dilemma of choosing between violating an important religious principle or surrendering his or her driving privileges. "While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial." *Thomas*, 450 U.S. at 718.

## C.    *Standard For Assessing Constitutionality of Burden*

Not all burdens upon religion violate the Free Exercise Clause. *United States v. Lee*, 455 U.S. 252, 257 (1982). Nor does the fact that a person's religious practice is burdened by a governmental program mean that an exemption accommodating his or her practice must be granted. *Thomas*, 450 U.S. at 718.

---

[3] Your inquiry was prompted by a constituent's contention about the impact of the photo requirement on his religious practice. We do not believe it to be appropriate in an opinion to assess the particulars of your constituent's claim.

[4] *Thomas* involved a state's denial of unemployment benefits to someone who quit a job after being assigned to a department that made weapons components. The employee's sincerely held religious beliefs precluded his participation in the production of armaments. 450 U.S. at 709-10.

The test for determining the legality of a governmental burden on religiously motivated practice has undergone a remarkable set of reverses. More than 30 years ago, the Supreme Court held that any "incidental burden on the free exercise of religion may be justified by a compelling state interest in the regulation of a subject within the state's constitutional power to regulate ...." *Sherbert*, 374 U.S. at 403 (internal quotation marks and citation omitted). "[N]o showing merely of a rational relationship to some colorable state interest would suffice .... Only the gravest abuses, endangering paramount interests, give occasion for permissible limitation." 374 U.S. at 406 (internal quotation marks and citation omitted). *See also McMillan v. State*, 258 Md. 147, 152, 265 A.2d 453 (1970); *Mercy Hosp. v. Jackson*, 62 Md. App. 409, 415, 489 A.2d 1130 (1985), *vacated as moot*, 306 Md. 556 (1986); *Snyder,* 30 Md. App. at 326.

In a 1990 tour de force, however, Justice Scalia, for a five-justice majority, eviscerated *Sherbert*. 110 S.Ct. at 1602-03. The Court eliminated the "compelling governmental interest" standard espoused in *Sherbert* for generally applicable laws by limiting it to unemployment compensation cases. Religiously neutral laws of general applicability that have the effect of burdening particular religious practice cannot be evaluated under the balancing test of *Sherbert*, the Court held. 110 S.Ct. at 1603. Instead, as the Supreme Court recently explained, the standard under *Smith* is this:

> [A] law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice. Neutrality and general applicability are interrelated, and ... failure to satisfy one requirement is a likely indication that the other has not been satisfied. A law failing to satisfy these requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest.

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 113 S.Ct. 2217, 2226 (1993) (citation omitted).

The latest and perhaps last chapter in the story was written by the United States Congress.  In the Religious Freedom Restoration Act of 1993 (the "RFRA"), Congress restored the compelling interest requirement of *Sherbert*.   The RFRA is applicable retroactively to both federal and state law. 42 U.S.C. §2000bb-1(6).[5] The heart of the RFRA, subsection (3), provides as follows:

> Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person —
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. §2000bb-1(b).  The RFRA is intended "to restore the compelling interest test set forth in *Sherbert* ..., to guarantee its application in *all* cases where free exercise of religion is substantially burdened ...."  42 U.S.C. §2000bb(b)(1) (emphasis added, citations omitted).

The legislative history of the RFRA expresses the intent that "the courts will look to free exercise cases decided prior to *Smith* for guidance in determining whether the exercise of religion has been substantially burdened and the least restrictive means have been employed in furthering a compelling government interest."  S. Rep. No. 103-111, 103d Cong., 1st Sess. 8-9 (1993), *reprinted in* 1993 U.S.C.C.A.N. 1892, 1898.

The constitutionality of the RFRA itself might be challenged in the future, of course.  Congress' constitutional authority to enact the RFRA depends on the scope of Section 5 of the Fourteenth Amendment, which empowers Congress "to enforce, by appropriate legislation, the provisions" of the amendment.  In the past, Congress has generally exercised its Section 5 authority with respect to the

---

[5] The RFRA, Pub. L. No. 103-141, 107 Stat. 1489, was signed into law on November 16, 1993.

Equal Protection Clause. *See, e.g., Ex parte Virginia*, 100 U.S. 339 (1880) (Civil Rights Act of 1875).

However, "[a] right or an immunity, whether created by the Constitution or only guaranteed by it, even without any express delegation of power, may be protected by Congress." *Strauder v. West Virginia*, 100 U.S. 303, 310 (1880). Moreover, "there is express authority to protect the rights and immunities referred to in the Fourteenth Amendment, and to enforce observance of them by appropriate congressional legislation." *Id*. at 311. *See also, e.g., Kletschka v. Driver*, 411 F.2d 436, 447 (2d Cir. 1969) (Congress has power under the Fourteenth Amendment "to legislate against state action of every kind having the effect of impairing federally guaranteed rights, and Congress had exercised that power in [42 U.S.C.] §1983") (internal quotation marks and citation omitted). Because the Free Exercise Clause has been incorporated into the "liberty" component of the Fourteenth Amendment, we think it most unlikely that a court would strike down the RFRA, and we shall apply it in analyzing your question.

## III

### The Validity of the Photograph Requirement

In *Quaring v. Peterson*, 728 F.2d 1121 (8th Cir. 1984), *aff'd by an equally divided Court*, 472 U.S. 478 (1985), the federal appellate court held that a provision of Nebraska driver's licensing law requiring applicants to sit for a color photograph, to be affixed on the license, unconstitutionally burdened an applicant's free exercise of her religious belief that forbade the making of graven images. 727 F.2d at 1126. The court said that the government's interest in providing police officers with an accurate and instantaneous means of identifying a motorist was not compelling, particularly in view of the fact that Nebraska exempts numerous motorists from having personal photographs on their licenses.[6] *See also Dennis v. Charnes*, 646 F. Supp. 158 (D. Colo. 1986) (state's interest in facilitating its

---

[6] Nebraska exempted from the photograph requirement learner's permits, school permits issued to farmers' children, farm machinery permits, special permits for those with restricted or minimal driving ability, or temporary licenses for individuals outside of the state whose old licenses have expired.

identification of vehicle operators at accident scenes and during traffic stops, though legitimate, was not sufficiently compelling where other drivers were issued special licenses without photographs); *Bureau of Motor Vehicles v. Pentecostal House of Prayer, Inc.*, 380 N.E.2d 1225 (Ind. 1978) (state's interest in ensuring driver competency did not require a photograph and in turn was not sufficiently compelling).

Unlike the state interests advanced by Colorado, Nebraska, or Indiana in these cases, Maryland's interest in the photograph requirement goes to the core of government's role in protecting its citizens against victimization. The State's interest in preventing individuals from establishing a false identification by means of a driver's license is not simply a matter of administrative convenience. Since driver's licenses are used to establish identity for a host of commercial transactions, the photograph requirement, intended to permit a merchant to establish that the license is really that of the individual proffering it, serves the compelling interest in protecting the public from fraud.[7] *Sherbert v. Verner* itself recognized that the prevention of fraud was potentially a sufficiently compelling "abuse or danger." 374 U.S. at 407.[8] *See* Lawrence N. Tribe, *American Constitutional Law* §14-13, at 1273 (2d ed. 1988). *See also Riley v. National Federation of the Blind*, 487 U.S. 781, 792 (1988) (discussing an interest that would justify a narrowly tailored regulation of speech).

Furthermore, the photograph requirement and its vital role in preventing fraudulent identification is directly linked to what is an even more compelling governmental interest — safeguarding public safety. Few will have forgotten the shocking events surrounding the abduction and murder of Vitalis Pilius, whose killer, Dontay Carter, "was able to obtain a replacement driver's license in the name of the man he killed by claiming the license had been lost in a fire. Carter

---

[7] In fact, as the single most important identifying document, a driver's license is the key that enables someone to obtain other documents under the same name. thus, a fraudulent driver's license is a passport to wider document fraud.

[8] In *Sherbert*, the state failed to show that this abuse of its unemployment benefits system was likely or could not be dealt with by other means. *Id.*

used the license to rack up charges on [the victim's] credit cards and to elude police." Peter Jensen, *MVA Updating Security*, Baltimore Sun, May 30, 1993, at 1B. Carter got the false credentials by burning parts of the license, including the picture of the victim, but not the personal information on the license, *i.e,* address, height, weight, *etc.* He then presented the burned license to an MVA employee. Another license was reissued with Carter's picture and the personal information of the victim.

In immediate response to this tragic incident, MVA implemented an entirely new driver's licensing system. Baltimore Sun, May 30, 1993, at 5B. The new system captures a digitized image and signature of the applicant, which are placed into the MVA database and used to verify the applicant's identity for renewal and reissuance if the license is ever lost or stolen. The linch-pin of the new system is the requirement that an applicant have his or her photograph taken. In fact, the photograph of the applicant is indispensable to the effectiveness of the new system. Thus, the compelling State interest is assuring the reduction, if not elimination, of fraudulent use of a driver's license by issuing licenses with accurate photographs.[9]

Furthermore, unlike the states in the three cases cited above, which provided *permanent* nonphoto licenses, MVA only issues *temporary* nonphoto license. When a state allows many of its drivers to hold nonphoto licenses, it is easy to see how a court would infer that the state's interest in having photographs on driver's licenses is not really so compelling. No such inference is possible in Maryland.

Nor is it reasonable to conclude that the State's compelling interest could be served just as well by other means of identification. In *Bureau of Motor Vehicles v. Pentecostal House of Prayer, Inc.,* the Indiana court, in addition to holding that Indiana's interest in ensuring driver competency was not sufficiently compelling, opined that the state's interest in speedy, positive identification could be met through alternatives to a photograph. Specifically, the court wrote,

---

[9] Moreover, while the predominant State interest is that of public safety, the State also has an interest in aiding law enforcement officials, who have access to the database, to identify motorists on the highways and in administrative efficiency.

"statistics which are traditionally included on driver's license, such as license number, height, weight, eye and hair color, have long proven adequate to enable the [state] to fulfill its important duties." 380 N.E.2d at 1229.

This reasoning is faulty, for it ignores the reality that thousands of people share similar height, weight, and other physical characteristics and that observers overlook differences when given these data without a photograph.[10] Even when these features are described on a license, they are far less effective in identifying an individual than a photograph – particularly, as under the new MVA system, when the photograph itself becomes immediately available from MVA's computer database.

The Supreme Court has said:

> To maintain an organized society that guarantees religious freedom to a great variety of faiths requires that some religious practices yield to the common good. Religious beliefs can be accommodated but there is a point at which accommodation would radically restrict the operating latitude of the legislature.

*Lee*, 455 U.S. at 259 (internal quotation marks and citation omitted). In our view, the General Assembly and MVA have the "operating latitude" to decide that driver's licenses with photographs are the only effective means to achieve the compellingly important end of deterring fraudulent access to or use of driver's licenses.

---

[10] Dontay Carter weighed much less than his victim and had different hair and eye color, but nevertheless, he was able to deceive an MVA employee and obtain a fraudulent replacement license, and later deceive a law enforcement officer. Thus, personal information alone was not effective in preventing the fraud.

## V

## Conclusion

In summary, the State may deny a driver's license to an individual who objects on religious grounds to the inclusion of the individual's photograph on the license.


J. Joseph Curran, Jr.
*Attorney General*

Jack Schwartz
*Chief Counsel*
 *Opinions & Advice*

Kimberly Smith Ward
*Assistant Attorney General*

***Editor's Note:***

Contrary to the prediction in Part II of this opinion, the United States Supreme Court held that the Religious Freedom Restoration Act could not constitutionally be applied to state and local government, because its enactment exceeded Congress' power under the Fourteenth Amendment. *City of Boerne v. Flores*, 117 S.Ct. 2157 (1997).